**MOORE, Com'r of Public Records and Finance, et al. v. LOGAN, Mayor. (No. 1692.)**

Court of Civil Appeals of Texas. Beaumont.
Aug. 20, 1928.

Rehearing Denied Sept. 27, 1928.

J. W. O'Neal, of Port Arthur, and Sonfield & Sonfield, of Beaumont, for appellants.

Wistner & Lamson, of Port Arthur, for appellee.

O'QUINN, J. J. P. Logan, mayor of the city of Port Arthur, brought this suit against C. B. Moore, commissioner of public records and finance of the city of Port Arthur, and B. J. Wade, commissioner of public property and improvements of the city of Port Arthur, and Carroll Carlson, who, it is alleged, is assuming to act as commissioner of public utilities of the city of Port Arthur. Plaintiff sought an injunction to restrain appellants Moore and Wade from passing any ordinance, resolution, or rule affecting plaintiff's duties as mayor or in the enforcement, or attempting to enforce, any ordinance, resolution, or rule passed taking from plaintiff control of the collection and disposal of the city garbage, and to restrain Carlson from assuming or attempting to discharge any duty or duties in connection with the garbage department of the city, or assuming, or attempting to assume, any control thereof, and from interfering with plaintiff in any manner in exercising complete control of the garbage department of said city, and to restrain appellants Moore and Wade from paying, or attempting to pay, out of the funds of the city of Port Arthur any sum of money to appellant Carlson for any such service performed by him.

A temporary injunction was issued ex parte.

Appellants, defendants, filed answer and motion to dissolve. On hearing of the motion certain exceptions by appellants to plaintiff's petition were sustained. Plaintiff then filed his first amended original petition, and prayed for an injunction to restrain appellants from interfering with plaintiff in the exercise of his duties as mayor of the city of Port Arthur in the operation of the water and sewer departments and the collection and disposal of garbage, and that appellants Moore and Wade be enjoined from paying, or attempting to pay, out of the funds of the city of Port Arthur any sum or sums of money to appellant Carlson, and for general and special relief in the premises.

Upon a hearing upon the merits, appellants' motion to dissolve was denied and the temporary injunction made permanent. From the order and judgment of the court appellants have appealed.

The city of Port Arthur operates under a special charter granted by the Legislature in 1911 (Loc. & Sp. Laws 1911, c. 52). This charter has been amended in several particulars under the Home Rule Amendment to the Constitution and Enabling Act. By agreement of the parties the printed book of ordinances and the printed charter of the city and Ordinance No. 908 were introduced in evidence, and are filed as a part of the record here.

The issues involved are clearly manifested in the allegations of appellee's first amended original petition, the basis of the action being the alleged invalidity of an ordinance known as chapter 23 of the printed Code of Ordinances of the city, creating a department of public utilities, and resulting in the appointment of appellant Carlson as superintendent of public utilities in charge of the water, sewer, and garbage departments of the city; the petition alleging specifically the grounds of invalidity, being chapter 23 of the printed Code of Ordinances, the appointment of Carlson, and the resolution placing the garbage department under the superintendency of Carlson.

In substance, appellee alleged as grounds for the injunction:

(a) That he is the duly elected and qualified mayor of the city of Port Arthur, and that appellants Moore and Wade are the duly elected and qualified commissioners, respectively, of public records and finance and public property and improvements of said city, and that appellant Carlson is assuming to act as superintendent of public utilities of and for said city.

(b) That in accordance with the charter and ordinances of the city, he, as mayor, is vested with all the powers in connection with the administration of affairs of the city, save and except those which are specifically designated to Moore, as commissioner of public records and finance, and Wade, as commissioner of public property and improvements.

(c) That, as mayor, he is specially charged with the enforcement of all the police, fire, and sanitary ordinances and regulations of the city; that he is chairman of the board of health, and has supervision of the police department and such other duties as are set forth in sections 4 and 7 of chapter 3 of the charter, which were attached to, and made a part of, his petition.

(d) That Moore, as commissioner of public records and finance, under the charter is charged with the duty of collecting all revenues belonging to the city, keeping a correct account thereof, as shown by section 3, chapter 3, of the charter, a copy of which is attached to his petition.

(e) That Wade, as commissioner of public property and improvements, under the charter has special charge of, and the care and maintenance of, all parks, playgrounds, and buildings belonging to the city, except as otherwise provided, and has supervision of the streets, avenues, and alleys, and is charged with the duty of lighting the city, and keeping the streets, plazas, parks, and other public grounds and property in a clean, sanitary condition, as shown by section 6, chapter 3, of the charter, attached as an exhibit to appellee's petition.

(f) That the duties of Moore and Wade, as commissioners of public records and finance and public property and improvements, are designated and made specific in the charter; that plaintiff, as mayor, is charged with the duty of protecting and guarding the health, safety, and welfare of the inhabitants of the city; that in accordance with the charter he is to perform, and it is made his duty to perform, all matters and things not specially designated to either of the other two commissioners; and that as mayor of the city he is chairman of the board of health.

(g) That under the charter it is his duty to provide the city with pure and wholesome water, to keep the city clean and sanitary, in order to protect the health of the inhabitants.

(h) That the charter provision plainly and specifically set forth the duties to be performed by the commissioner of public records and finance and the commissioner of public property and improvements, and that nowhere in said charter are either of said commissioners expressly or by implication made responsible for the operation of any utility of the city, or the furnishing of pure and wholesome water, or guarding the health and welfare of the city; that in order to promote the health of the city it is necessary that pure and wholesome water be furnished, and that the city be kept clean and sanitary, which includes the collection and disposal of garbage, all of which is under his control as mayor of the city, and which duties he is willing and able to assume and discharge.

(i) That on about August 11, 1913, the city commission passed an ordinance providing for the creation of a public utilities board, which is chapter 23 of the Code of City Ordinances, entitled "Public Utilities Department," and which provides for the appointment of members to constitute said utilities board; said board being vested with authority to employ a superintendent for said board and to fix his compensation.

(j) That said ordinance creating said public utilities board and all amendments thereto are void because not authorized by the charter of said city; that the appointment of said Carlson as superintendent of said board is null and void, and any compensation paid to him is paid without authority of law, and the payment of compensation to said Carlson

is unlawful and a wanton waste and extravagance of funds belonging to said city.

(k) That plaintiff, as mayor, is charged with the duty of looking after and managing the operation of said utilities, and he is ready, willing, and able to do so, which will be without cost to said city other than the salary he is receiving and will continue to receive.

(l) That on or about the ——— day of January, 1928, defendants Moore and Wade passed an ordinance, resolution, and rule, by the terms of which plaintiff will be, deprived of his power and authority to regulate and control the collection and disposition of the garbage of the city, and, in pursuance thereof, employed and attempted to employ and to pay defendant Carlson the sum of $400 per month for looking after and superintending the said department, which plaintiff is ready and willing and has always so been to superintend; that said ordinance, resolution, and rule was passed in violation of section 1, chapter 2, article 2, of the charter of said city entitled "Legislative Duties of Commissioners and Officers," wherein it provides that "no ordinance, resolution, motion or action directly and specifically affecting the department presided over by 'any commissioner shall be passed or taken in the absence of such commissioner, nor without his affirmative vote;" that depriving plaintiff of the right to superintend and control the garbage department affects his department, as is shown by chapter 34 of the Code of Ordinances of said city entitled "Health and Sanitation Department"; that said ordinance, resolution, and rule was taken without his affirmative vote, and is therefore void.

(m) That plaintiff, aside from being mayor of said city, is a citizen of said city, and pays a large sum of money as taxes, which is used by the city in paying operating expenses and for the betterment of its properties.

(n) That the employment of said Carlson to superintend the operation of the public utilities of said city is an attempt to delegate the authority vested in the commission of said city, and deprives plaintiff of the control thereof; that it is a waste of the funds of the city, and would result in an increase of plaintiff's taxes.

(o) That the payment of a salary to defendant Carlson is unauthorized, for in that the financial matters of the city are operated under what is known as the "Budget Plan" provided in the charter, and the commissioners have no right, power, or authority to expend any money whatsoever for any purpose not included in the budget and submitted to the voters for their approval at an election held for that purpose; that the salary of said Carlson was not included in the budget for the expenses of said city for the year 1927, and the voters of said city have not authorized the commissioners to pay said Carlson the salary which the commissioners have agreed and contracted to pay him,

Recapitulating briefly, it is alleged that the employment of Carlson is null and void, because:

(1) The creation of said utilities board, and all ordinances passed in attempting to create same, is null and void because in violation of the charter of the city, which defines the duties of each of the several commissioners.

(2) It is an effort on the part of the commission to interfere and delegate their authority to a board and in a person whose employment by the city is unauthorized and contrary to the charter provisions.

(3) No provision was made for the payment of Carlson's salary in the last city budget election, and the charter requires that all sums of money to be expended must be submitted to the voters of the city and authorized by a majority vote before the commissioners are authorized to expend any sums for any purpose.

(4) The employment of Carlson directly affects the department of the city government over which the plaintiff presides, and said action was taken without the affirmative vote of the plaintiff, as required by the charter.

(5) The plaintiff, as mayor of the city, has the right and is given the express power to appoint all the officers and employés in his department of the city government, subject to confirmation by the other two commissioners, and Carlson was not appointed by the plaintiff, nor did his appointment or election have plaintiff's affirmative vote.

(6) That the ordinance, resolution, or rule passed on the 19th day of January, 1928, giving Carlson superintendency of the garbage department, is void because it is an attempt to repeal chapter 34 of the Code of Ordinances, entitled "Health and Sanitation Department," by an order, resolution, or motion, whereas no ordinance duly published can be repealed or amended except by the passage of an ordinance duly published, as provided by the charter of the city.

Appellants' first, second, and third propositions are to the effect: (a) That the city of Port Arthur is expressly authorized under its charter to establish and maintain a public utilities department and to employ a superintendent thereof, vesting in him such power and authority as the city commission, in its discretion, may deem proper; (b) if the commission of the city of Port Arthur is not expressly authorized by the charter to establish and maintain a public utilities department and to employ a superintendent thereof, it is impliedly authorized thereto; and (c) the ordinance of August 11, 1913, being chapter 23 of the Code of Ordinances, entitled "Public Utilities Department," and all subsequent amendments thereto, is in all things valid. We shall discuss these together.

August 11, 1913, the commission of the

city of Port Arthur passed an ordinance creating a public utilities department of and for said city. It appears as chapter 23 of the Code of Ordinances of said city. Section 1 creates a public utilities department of and for said city; section 2 provides that said department shall be under the supervision and control of a board of commissioners, consisting of ten members, to be nominated by the mayor and confirmed by the commission. This was subsequently amended, so that nine members instead of ten should constitute the commission, three to be nominated by the mayor and three by each of the other two commissioners. Section 3 fixes the powers and duties of the commission: (a) At the request of the city commission to investigate and report to the city commission, with plans, estimates, suggestions, and recommendations as to whether or not it is advisable, feasible, or for the best interest of the city to grant any franchise for or to buy, construct, own and operate, or own and lease, either within or without the city limits, any and all public utilities such as gas, ice, water, sewerage, electric light and power works, street railways, telephones, telegraphs, and wires used for the transmission of any electric service or other public utility service, enterprise, or agency; (b) under the direction and regulation of the commission of said city, to have supervision and management of any and every such utility which may be owned, maintained, or operated by said city; (c) to investigate and report to the city commission in reference to a fresh-water supply; (d) to have, possess, and exercise all such powers and authority, and perform all such other duties, as are or may be given, conferred, or imposed upon them by the charter of said city, the laws of the state of Texas applicable thereto, or by any ordinance of said city adopted and in force. Section 4 authorizes said utilities commission to employ, subject to approval by the city commission, skilled or common labor, and to purchase material and supplies which may be found to be proper and necessary in the performance of their duties. Section 5 provides that the utilities commission shall be an advisory board to the city commission, with power and authority to investigate and make recommendations to the city commission, but that no act of the utilities commission shall be binding on the city unless and until same has been reported to and approved by the city commission. Section 6 provides that there shall be a superintendent of and for the public utilities department, to have supervision of the waterworks and sewer departments of the city, and general supervision of said public utilities department, said superintendent to be nominated and recommended by the utilities commission, and shall be confirmed or rejected and may be dismissed by the city commission, and shall be under the direction and control of the city commission. Section 7 provides that the utilities commission shall investigate and recommend to the city commission a suitable person for appointment as superintendent of the public utilities department, and plans and systems or methods for managing, operating, controlling, caring for the waterworks and sewer departments of said city, etc. Section 8 provides that the utilities commission should recommend rates and charges for making connections to water and sewer mains, etc. Section 9 provides, in part, that the superintendent of public utilities shall be ex officio superintendent of the water department and superintendent of the sewer department of the city, and of any other public utilities owned by the city, and sewer engineer, sewer inspector, plumbing inspector, and inspector of water, gas, and electric meters and materials of all kinds, whether used by the city or private persons, firms, or corporations furnishing any utility for consumption in the city.

It cannot be doubted that under and by virtue of this ordinance all of the public utilities of the city are placed in the department of public utilities and under the direction of the superintendent of said department. Said superintendent is given charge, not only of the water and sewer departments, but of any other public utilities owned by the city. It is not contended that the ordinance creating the public utilities department and amendments thereto were not passed in compliance with the provisions of the charter, but the contention is that the city commission did not have the power, under the charter, to enact the ordinance. We believe that the ordinance finds express authority in the charter. Article 3 of the charter sets forth the "Powers and Rights" of the city granted in the act constituting its charter. Chapter 6 of this article is entitled "Powers Relating to Utilities and Franchises." Section 1 of this chapter authorizes the city "to buy, condemn, construct, own and operate or own and lease, either within or without the city limits, any and all public utilities, * * * and to regulate and control any such utility in a manner to protect the interest of said city. * * *"

Section 3 provides that—

"The Commission shall have the power to provide the city with water, or to cause the same to be provided, and for this purpose to make, establish, regulate and maintain public wells, pumps, artesian wells, cisterns, reservoirs, hydrants, dams, standpipes, water mains, water pipes and water meters, and all such other equipments, property, etc., as may be necessary in the streets or at such other place or places as to the said Commission may seem proper; and to establish and maintain a water works or public utilities department, and may clothe and vest the officers, agents and employés elected and appointed thereto, with such power and authority as in the discretion of said Commission may or shall seem proper."

The various sections of this chapter specify the powers of the city under its charter to create, own, or lease public utilities to serve the city and to regulate and control same, and while the authority to establish and maintain a public utilities department is mentioned in connection with a water system, yet that power is set forth in the article enumerating the "Powers and Rights" granted to the city under its said charter, and in chapter 6 of said article, which deals directly with such utilities. Therefore, such authorization to create a public utilities department should be held to and does apply alike to all public utilities serving the inhabitants of said city, and so is direct authority to the city commission to do as it did do, establish a "public utilities department," and to clothe its agents and employés conducting same with the authority and power to carry out the purpose for which it was created, as reflected by chapter 23 of its Code of Ordinances in question.

Furthermore, we are of the opinion that if the express authority to establish a "public utilities department," above set forth and discussed, had not been given in the charter, nevertheless, the implied power to do so existed from other provisions of the charter. These provisions are:

(1) Section 2 of chapter 1 of article 2 of the charter provides:

"The government of the City of Port Arthur and exercise of all the powers conferred upon it shall be and are hereby conferred upon and vested in three Commissioners. * * * The three Commissioners * * * shall be elected by the duly qualified voters of said City and they shall hold their office for the term of two years from their election and until their successors are elected and qualified. Said three Commissioners shall have power to elect or appoint all other officers, subordinates, boards and employees of said City as may be authorized or provided for in this act."

(2) Section 1 of chapter 2 of article 2 provides:

"The three Commissioners, acting together, * * * shall enact all such ordinances, resolutions, rules and regulations, not inconsistent with the Constitution of this State, or the provisions of this Act, touching every object, subject and matter within the purview of the local government hereby created, as shall be for the best interests and welfare of said City and its inhabitants, and as they may deem fit and proper for the organization, management, and operation of all the departments of said city, and whatever agencies may be created for the administration of its affairs."

(3) Section 1 of chapter 6 of article 3 of the charter provides:

"Section 1. *Utilities—City May Own, Operate, etc.*—The City of Port Arthur shall have the power to buy, condemn, construct, own and operate or own and lease, either within or without the city limits, any and all public utilities, such as gas, ice, water, sewers, sewerage plants, crematories, electric light and power works, or underground conduit systems for electric lights, power, telephone, telegraph, or any other electric service, and underground, surface and elevated railways, subways, municipal railway terminals, docks, wharves, ferries, ferry landings, elevators, loading and unloading devices, shipping facilities, and any other public utility service, enterprise or agency that may be approved by a majority of the qualified proper tax paying voters of said city at any regular or special election, and may acquire and own by purchase, condemnation or in any manner whatsoever, within or without the limits of said city, the land or property of any person, firm or corporation for the purpose of constructing, installing, buying, operating, or maintaining any such utility, and for the distributing any such service throughout the city or any portion thereof, but in such condemnation proceedings, no allowance shall be made for the value of any franchise; the city may obtain funds for the purpose of acquiring the said public utility and paying the compensation therefor in any manner provided in Section 20, of this chapter, or elsewhere in this Charter, or by issuing bonds or notes or other evidence of indebtedness and securing the same by fixing a lien on said properties constituting otherwise, and said security shall apply to the said property so pledged, and to regulate and control any such utility in a manner to protect the interest of said city and to sell ice, water, gas, electric light and power and sewer privileges, and any and all other such services, to any person or corporation outside the limits of said city and to permit them to connect therewith under contract with said city under such terms and conditions as may appear to be for the best interest of said city; to prescribe the kind of water or gas mains, or sewer pipes, and electric appliances within or beyond the limits of said city; and to inspect the same and require them to be kept in good order and condition at all times, and to make such rules and regulations and prescribe such penalties concerning the same as shall be necessary and proper; and said city shall also have power to contract with persons, firms or corporations for supplying the city and the inhabitants thereof with water, lights, electric or other power, sewers, telephones and all other kinds of public service, and to agree upon maximum rates to be paid therefor, but it shall not have the right to abrogate the city's power to fix rates as provided in this charter, and the laws of the State."

Section 6 of chapter 6 of article 3 provides:

"The Commission shall have the power to adopt rules and regulations for the management of the water works and sewerage systems, and it shall have power to make and establish a schedule of water and sewer rates and tolls and prescribe the mode and manner of the construction of the service pipes, alleys, laterals and house connections, and all other connections with the water mains and sewer pipes, and pass all ordinances necessary for the protection and preservation of the said water works and sewerage systems, and for the prevention of waste and damage thereto."

Under the above provisions, the city may have all such public utilities, public utility

service, enterprise, or agency as may be to the best interest of the city. The commission is given authority to regulate all public utilities, public utility service, enterprises, or agencies, and to enact all such ordinances, resolutions, rules, and regulations as the commission may deem fit and proper for the organization, management, and operation of all the departments of the city, and whatever agencies may be created for the administration of its affairs, This necessarily includes the power to create and establish a department as an agency for the administration of its public utilities.

■ Appellants' fourth proposition asserts that—

"The collection and disposal of garbage by the city is a public utilities service, enterprise or agency, properly forming a part of the public utilities department."

By his fourth counter proposition, appellee denies this, and says that the collection and disposal of the garbage of the city is not a public utilities service and forms no part of the public utilities department. There is no set definition of what constitutes a "public utility," and in fact it would be difficult to construct one that would fit every conceivable case. "Utility" means the state or quality of being useful, hence the expression "public utility" means the state or quality of being useful to the public, generally used in the sense of "public use," carrying with it the duty to serve the public and treat all alike, and precludes the idea of service which is private in its nature. The adjudicated cases show that "public utilities" have been held to include such public conveniences as sewers, waterworks, gas plants, public parks, a convention hall (owned, controlled, and used exclusively by the city), power stations and equipment, street cleaning equipment, electric light plants, street railways, city cemeteries (used exclusively for burial purposes and open to the public at large), auditoriums, bathing pools, wharves, and golf links (considered within the meaning of a city charter authorizing the municipality to acquire public utilities). McQuillan on Municipal Corporations, vol. 4, § 1618; Denton v. City of Sapulpa, 78 Okl. 178, 189 P. 532, 9 A. L. R. 1031 (1034); Capen v. City of Portland, 112 Or. 14, 228 P. 105, 35 A. L. R. 589; City of Belton v. Ellis (Tex. Civ. App.) 254 S. W. 1023 (writ refused); 3 Bouv. Law Dict. 2767; 4 Words and Phrases, Second Series, 49. The term "public utility" has a broader meaning than that of mere physical equipment. The term "public utility," as operated by a municipality, refers to the entire business, including both the plant and its operation. The collection and disposal of garbage in a city is a very important service, as much so as the furnishing of pure and wholesome water or an efficient sewerage system. It requires a vast physical equipment, including an incinerator, all owned and operated by the city, and we think must be held to be a public utility of the city. It being such, under chapter 23 of the Code of Ordinances of the city, it was under the management and supervision of the superintendent of public utilities.

■■ In his petition, appellee asserted that the creation of the public utilities department and the powers conferred upon it and the duties prescribed to be discharged by it, as shown by the ordinances creating same, chapter 23 of the Code of Ordinances, was void, because same was an unlawful delegation of the powers of the commission of the city of Port Arthur, and therefore the ordinance creating said department was ineffective, and appellants should be restrained, as prayed by him. Appellants' fifth proposition denies this contention, and says that under the ordinance creating the public utilities department, said department is purely and simply an advisory board, and the powers conferred upon said department or board was not the delegation of any nondelegable powers of the commission. Section 5, chapter 23 (the ordinance creating the public utilities department), provides:

"The Utilities Commission of said city shall be an advisory board to the Commission of said city, with full power, authority and duty to investigate and make recommendations in writing to the City Commission, accompanied by full reports, plans, estimates and suggestions, giving all information, facts and matters presented to or in any manner acquired or possessed by said Utilities Commission or any of its members on all questions; * * * but no act of said Utilities Commission, or any member thereof, shall be valid or have any binding force or effect on said city of Port Arthur until the same has been first reported to and approved by the Commission of said city."

Section 7 is to the same effect, and provides that no appointment to any position or contract of employment or construction, purchase, etc., shall be binding on the city until first reported to and approved by the city commission. Section 6 of the ordinance provides for a superintendent of the public utilities department, "(he) to be nominated and recommended by the Utilities Commission, confirmed or rejected, and may be dismissed by, and report to and be under the direction and control of the city commission." So it is seen that the board of commissioners of the utilities department is merely an advisory board. There is no character of delegation of the power of the city commission to the utilities commission, but, on the contrary, by the express terms of the ordinance, all powers of the city commission are reserved to it, and the superintendent of the public utilities department is in all things under the direction and control of the city commission, with power in the city commission to dismiss him at any time. However, if it could be said that

there was any delegation of power, it is not the delegation of nondelegable powers, but merely the delegation of ministerial or administrative functions, which does not impair the force or scope of the ordinance in question. McQuillan on Municipal Corporations, vol. 1, p. 242, § 387; 43 C. J. p. 242, § 240; Booth v. City of Dallas (Tex. Civ. App.) 179 S. W. 301, 305 (writ refused).

■ Appellee, in his first amended original petition, alleges:

"That in accordance with the charter and ordinances of said city he is vested with all powers in connection with the administration of the affairs of the city of Port Arthur, Texas, save and except those which are specifically designated to C. B. Moore, as Commissioner of Public Records and Finance, and B. J. Wade, as Commissioner of Public Property and Improvements."

He then alleges the duties which under the charter are imposed upon him as mayor and commissioner of public order and safety, and those imposed on commissioners Moore and Wade, attaching to his petition copies of these provisions as exhibits. He then alleges:

"That in accordance with said sections of said charter he is to perform and is charged with the duty of performing, all matters and things not specifically delegated to either of the other two named commissioners."

Article 2, chapter 3, section 2, of the charter provides:

"*Department of Commissioners.*—All powers conferred on the City, shall, unless otherwise provided in this Charter, be exercised by three Commissioners, one of which shall be Mayor and Commissioner of Public Order and Safety and Public Affairs, one of which shall be Commissioner of Public Records and Finances and one of which shall be Commissioner of Public Property and Improvements, who, together, shall be known and designated as the Commissioners of the City of Port Arthur and they shall perform such duties as may be provided in this Act or by Ordinances passed in pursuance of any powers herein."

Section 4 of same sets out certain specific duties of the mayor, and concludes:

"(He) shall perform such other duties as may be provided by the Charter of said city or by any Ordinance passed in pursuance of any powers therein."

Section 5 of same, after setting out specific duties of the commissioner of public records and finance, concludes:

"He shall perform such other and further duties pertaining to the finances, revenues, and public records, of the city as may be required of him by this Act, or by ordinance."

Section 6 of said chapter and article sets out the specific duties of the commissioner of public property and improvements, concluding:

"And perform such other duties pertaining to the public property and improvements of the city as may be provided by ordinance."

Port Arthur operates under the commission form of government. The purpose of cities in changing from the old aldermanic form of city government to the commission form was to restrict the power of the mayor, and to destroy one-man government, and to place the affairs of each department of the municipal government in the hands of a responsible agent or officer, to whom the people can look directly for the proper administration of the affairs of his department. An inspection of the charter shows that the mayor of Port Arthur is not vested with all the powers and duties not specifically delegated to the other two commissioners, but that the powers and duties not specifically delegated to the commissioners respectively are lodged in the city commission, and it is for the city commission, by ordinance, resolution, or rule duly passed, to place or impose the undelegated powers and duties upon the mayor or some other of the commissioners. The mayor, as commissioner of public order and safety, is charged with the enforcement of police power and sanitary ordinances, rules, and regulations. The only public utilities which he is placed in charge of under the charter, and which constitute a part of his department, is the city hospital, if any, and the fire department. He is nowhere in the charter given charge of the water, sewerage, or garbage. His duty is to see that all the ordinances, rules, and regulations of the city pertaining to any department are enforced. This because he is the chief executive of the city. The water, sewerage, and garbage departments not being specifically assigned by the charter to the mayor or any one of the commissioners, the power in reference thereto is lodged with the city commission, and the city commission being given authority to establish and maintain a public utilities department and to appoint all necessary employés, it did not in any manner invade any power or duty conferred by the charter upon appellee as mayor-commissioner by the passage of the ordinances entitled "Public Utilities Department," and known as chapter 23 of the Code of Ordinances of the city.

■ But appellee contends that the resolution of the city commission placing the collection and disposal of garbage under the superintendent of public utilities, Carlson, was inoperative and void because passed in violation of section 1, chapter 2, of article 3 of the Charter of the City of Port Arthur, entitled. "Legislative Duties of Commissioners and Officers," wherein it is provided that:

"No ordinance, resolution, or motion, or action directly and specifically affecting the department presided over by any Commissioner, shall be passed or taken in the absence of such Commissioner, nor without his affirmative vote."

It is pleaded and urged by appellee that the said order or rule passed by the city commission deprived him of superintending and controlling the garbage department, and affects his department, as shown by chapter 34 of the Code of Ordinances of the city, intitled "Health and Sanitary Department," which provides that "the health department of the City of Port Arthur, Texas, shall be under the supervision and charge of the Commissioner of Public Order and Safety of said city, and shall have charge and supervision of all the matters relating to and affecting the health and sanitation of said city and the citizens thereof, and shall include the regulation and supervision of the gathering and disposal of garbage, etc."; and that said action was taken without his affirmative vote, and therefore is in violation of section 1 of chapter 2 of article III of said city charter, and void.

This contention is not sound. The charter authorized the creation by the city commission of a "public utilities department." The ordinance known as chapter 23 of the Code of Ordinances of the city was duly passed creating this department, appellee voting for said ordinance. This ordinance provided for a "board of utilities commissioners" to act as an advisory board to the city commission; that under the direction of the city commission said board of utilities commissioners should have the supervision and management of "any and every such utility which may be owned, maintained or operated by said city"; that there should be a superintendent of and for said public utilities department, who should have general supervision and management of said department; that said superintendent to be nominated and recommended by the utilities commission and confirmed or rejected by the city commission, and should be under the direction and control of, and subject to be dismissed by, the city commission. The city commission, on motion of appellee, duly seconded and carried, invited and instructed the utilities commission to nominate and recommend a superintendent of public utilities. In obedience to this invitation and instruction, the utilities commission nominated and recommended Carlson as superintendent of public utilities. Carlson's appointment was confirmed by the city commission, appellee voting against confirmation, and the other two commissioners voting for confirmation. The record discloses that when Carlson's appointment was confirmed, appellee said he would "do all in his power to assist Mr. Carlson in his work," but that he would be opposed to Carlson's having anything to do with the garbage department, as he did not consider that a public utility. So it is seen that if it could be said that the water, sewerage, and garbage departments, or either of them, constituted a portion of the department of the city government under the supervision of appellee, they were taken out of same and placed under the supervision of the superintendent of public utilities by the affirmative vote of appellee, as he voted to create the public utilities department and for the appointment of a superintendent of same, although he did not vote to confirm the individual who was nominated and recommended by the utilities commission, in pursuance of the provisions of chapter 23 of the Code of Ordinances. The charter does not provide that appellee should vote for confirmation, but merely provides that the appointment should be confirmed by the city commission, which was done by a majority of the commissioners, as provided in section 1, chapter 2, article 3, of the charter.

It is urged by appellee that when Carlson was appointed and confirmed as superintendent of the public utilities department, he did not take charge of the garbage department, but only took charge of the water and sewerage departments, and that afterwards a resolution or motion was passed by the city commission, instructing him to take charge of the collection and disposal of garbage, and that this was not done with the affirmative vote of appellee, but over his protest. We do not deem this action of the commission material. The public utilities department had already been created, in pursuance of authority contained in the charter, and this department, under the direction and regulation of the city commission, had the supervision and management of "any and every" utility owned or operated by the city, and the garbage department being a public utility, it necessarily passed at once under the control, management, and supervision of the superintendent of public utilities. The resolution or motion passed by the city commission after Carlson's taking charge of said department did not add anything to the scope of Carlson's duties, because they had already been fixed by the ordinance creating the department of public utilities, providing for the appointment of a superintendent of same and prescribing his duties. Furthermore, section 9 of chapter 23 of the Code of Ordinances (the ordinance creating the public utilities department), further defining the duties of superintendent of public utilities, provides, among other things, that—

"The superintendent of public utilities shall be ex officio superintendent of the water department, and superintendent of the sewer department of the city, and of any other public utility owned by the city."

Therefore, if the collection and disposal of the garbage is a public utility, and we hold that it is, the superintendent of public utilities, in virtue of the ordinance, became ex officio superintendent of the garbage department.

It is further insisted by appellee that under chapter 34 of the Code of Ordinances, en-

titled "Health and Sanitation Department," the collection and disposal of garbage was placed under his supervision, and that the resolution to place the garbage department under Carlson as superintendent of public utilities affected a department presided over by him, and, having been passed without his affirmative vote, was null and void. This has already been answered, but we will again say that the charter authorized the establishment of a public utilities department, and the appointment of a superintendent of public utilities. The ordinance known as chapter 23 of the Code of Ordinances established the department of public utilities, and Carlson was appointed superintendent of same. The passage of the ordinance creating the public utilities department, the appointment of a public utilities commission in pursuance of that ordinance, and the request by the city commission of the utilities commission to nominate and recommend a superintendent of public utilities, were all with the affirmative vote of appellee, and Carlson's appointment was confirmed by a majority of the city commission, as provided in the charter. Under the ordinance, Carlson, as superintendent of public utilities, was by virtue of his office superintendent of water and sewer departments and of "any other public utility owned by the city." Therefore, aside from the resolution placing him in charge of the garbage department, he was the superintendent and had the management of same, by the express terms of the ordinance; the equipment for the collection and disposal of garbage and the operation of same by the city constituting a public utility of the city.

What we have said disposes of the contention of appellee that the provisions of chapter 34, wherein the collection and disposal of garbage is placed under his supervision, cannot be repealed by a resolution, but must be done, if at all, by an ordinance.

▮▮▮ The next contention of appellee is that the appointment of Carlson and fixing his salary at $400 per month was null and void, because no provision was made for the payment of Carlson's salary in the last preceding city budget election; the charter requiring that all sums of money to be expended must be included in the budget and submitted to the voters of the city and authorized by a majority vote before the commissioners are authorized to expend any sum for any purpose. With relation to its financial matters, the city of Port Arthur operated under the budget system. Section 6 of chapter 4 of article 5 of the city charter relates specifically to "Estimates and Budgets," and finally provides that—

"The commission shall not have the power to appropriate any money to any purpose not provided for in said budget and ordinance, except for unforeseen emergencies and contingencies provided by the city charter."

The form of the budget election ballot is provided by section 12 of chapter 3 of the Code of Ordinances, and the charter provides that an ordinance in proper form, making the necessary appropriations for the purposes enumerated in the budget, shall accompany same. The ordinance fixing and establishing salaries and compensation of all appointive officers and employés of the city for a term of two years beginning April 1, 1927 (known as ordinance 908), was in evidence. This ordinance was adopted January 27, 1927, which was prior to the appointment of appellant Carlson. We do not believe that this ordinance has application to the point in question, because section 3 thereof provides:

"The salaries and compensation of all additional employés appointed or hired during the term, if any, shall be fixed at the time of the appointment or hiring and not be thereafter changed during the term thereof."

The superintendent of public utilities is not an officer, but an employé, and he being employed subsequent to the passage of the budget ordinance, it was only necessary, in so far as that ordinance is concerned, that his salary be fixed at the time of his appointment, which was done. Section 6, chapter 4, article 5, of the city charter provides that the budget estimates shall be made up in April of each year for the ensuing year and the budget election held in June. The last city budget, that is, the one made up after Carlson was appointed superintendent of public utilities, was not introduced in evidence, nor is it incorporated in the Code of Ordinances in evidence. The only evidence as to what it contains is the testimony of the city clerk, which we think was incompetent, being the conclusion of the witness, to establish its provisions. That being true, there is no competent evidence in the record going to show that no provision was made for the salary of superintendent of public utilities in the last city budget. Furthermore, the charter provides that more than one office or place may be filled by the same person. It appears that before Carlson's appointment there was such a position as superintendent of water and sewer departments, and pay for this service at $250 per month was authorized and provided for. There was also provision for the payment of superintendent of the garbage department at $165 per month. Appellee testified that if Carlson was acting as superintendent of the water and sewer departments by virtue of his being superintendent of public utilities, he would be entitled to some salary for that service, and that it would be charged against the appropriation for these departments. The garbage department being a public utility, the same would apply to the appropriation for the superintending of that, also. Moreover, it also appeared that the expenses of the city, as provided for in the budget, had been cut since Carlson's appoint-

ment, and his assuming and discharging the duties incumbent upon him, more than his salary amounted to. In fact, it is shown that since Carlson's appointment the expenses of running the filtration plant, which is a part of the water system under Carlson's superintendence, and provision for the running of which had been made, was reduced $425 per month, which alone more than covered Carlson's salary. We think that as Carlson was performing the duties of an employé provided for in the budget, it should be said that he was entitled to receive the pay thus provided to the amount of his salary, and that it cannot be said that no provision had been made to pay same.

Furthermore, if there was no provision in the budget for the salary of superintendent of public utilities, this would not prevent the appropriation of money for that purpose by the city commission. Under the provisions of the charter in reference to city finances, it is provided:

"The Commission shall not have the power to appropriate any money to any purpose not provided for in said budget and ordinance except for unforeseen emergencies and contingencies provided for in the city charter."

A "contingency" is some further event which may or may not occur. 13 C. J. 113; Devin v. McCoy, 48 Ind. App. 379, 93 N. E. 1013. Under section 3 of chapter 6 of article 3 of the charter, the city commission is given the power to establish and maintain a public utilities department and appoint officers and employés therefor. This is not mandatory, but discretionary. The department could be established at any time within the discretion of the city commission. Its establishment was a contingency provided for by the charter.

Other propositions and counter propositions are presented and urged, but as what we have said disposes of the controlling issues, we do not deem it necessary to discuss them.

From what we have said, it follows that the injunction should not have issued and should be in all things dissolved, and it is so ordered.